UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                              )
N.S., et al.,                 )
                              )
     Plaintiffs,              )
                              )
     v.                       )     C.A. No. 17-0428-WES
                              )
BURRIVILLE SCHOOL COMMITTEE and )
BURRIVILLE SCHOOL DEPARTMENT,  )
                              )
     Defendants.              )
_____)
```

## MEMORANDUM AND ORDER

WILLIAM E. SMITH, Chief Judge.

Before the Court is Magistrate Lincoln D. Almond's Report and Recommendation ("R. & R.") (ECF No. 40), which recommends that Plaintiffs' Motion for Summary Judgment ("Pl.'s MSJ") (ECF No. 8) be denied and that Defendants' Cross Motion for Summary Judgment ("Defs.' MSJ") (ECF No. 15) be granted. Plaintiffs ("N.S." or "N.S.'s parents") objected to the R. & R. (ECF No. 42.) Defendants responded (ECF No. 44), and Plaintiffs replied (ECF No. 46.) After careful review of the R. & R. and the relevant papers, the Court accepts the R. & R. over Plaintiffs' objections.

I.  FACTUAL BACKGROUND

N.S. is a bright, hardworking graduate[1] of Burriville High School who has been diagnosed with cerebral palsy and autism. (See Pl.'s Mem. in Supp. of MSJ 2, ECF No. 8-1; Pl.'s Obj. to R. & R. 5, ECF No. 42.)  N.S.'s autism impairs her social skills and makes it difficult for her to switch between tasks, while her cerebral palsy impairs her motor skills and causes her to have an extremely low mental processing speed. (See Tr. VI 24:9-12, 61:7-12, 23.)  Both of her diagnoses constitute disabilities which adversely affect her ability to learn, as contemplated in the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, et seq., ("IDEA"). (Pl.'s Mem. in Supp. of MSJ 2.)  Pursuant to the IDEA, every year since she started preschool, N.S. has received an Individual Education Plan ("IEP") identifying certain special education services and accommodations that she must receive during the school

---

[1]  N.S.'s graduation from Burriville High School does not render this case moot because she is not yet twenty-two years old and because she alleged a viable claim for compensatory education in her Complaint. (See ECF No. 1); 20 U.S.C. § 1412(a)(1)(A) ("A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive. . .); Maine Sch. Admin. Dist. No. 35 v. Mr. R., 321 F.3d 9, 17-18 (1st Cir. 2003) ("[A] child eligible for special education services under the IDEA may be entitled to further services, in compensation for past deprivations, even after his or her eligibility has expired [and] . . . an actionable claim for compensatory education will insulate an IDEA case against a mootness challenge even after the child's eligibility for special education services ends.") (citations omitted).

year to help her manage her disabilities in the classroom. (Id. at 1-2.)

In ninth grade, N.S.'s IEP included a math goal and the school district paid for one-on-one tutoring in math; however, the parties agree that the tutoring was not a special education service, it was not provided by a special educator, and it was not included in N.S.'s IEP.[2] (See Hearing Officer's Decision 4-5 ¶¶ 11, 13, ECF No. 18-1 ("Decision"); Defs.' Undisputed Facts ¶ 4, ECF No. 17.)

In July of 2015, the parties agreed that Dr. Dana M. Osowiecki, PhD would conduct a psychoeducational evaluation of N.S. (See Admin. R. Pet'r's Ex. 2 "Dr. Osowiecki's Report.") Dr. Osowiecki noted that N.S.'s "basic math knowledge was average relative to age norms" and that "[t]he only math subtest that showed a weakness was her math fluency subtest, a speed-based test, which was below average." (Defs.' Undisputed Facts ¶ 16; R. & R. 3; see Tr. VI 30:10-31:16.) Dr. Osowiecki did not diagnose N.S. with a learning disability in math or indicate that N.S. needed specially designed instruction in order to succeed and make progress in math; instead, she opined that N.S. had a processing disorder that "impacted all activities that

---

[2]     It is undisputed that N.S.'s ninth-grade IEP also called for a special educator to be present in her math class and that no special educator was provided. (See Pl.'s Undisputed Facts, ¶¶ 27, 37, ECF No. 8-3; Defs.' Undisputed Facts ¶¶ 4, 6-7, ECF No. 17.) It is unclear from the record whether the tutoring was offered as an informal substitute for the special educator. Clarification is not necessary, however, because this dispute turns on the adequacy of N.S.'s tenth-grade IEP; as such, deficiencies in the delivery of IEP services during her ninth-grade year are beside the point.

required speed." (R. & R. 3 (quoting Defs.' Undisputed Facts ¶ 18).)
Dr. Osowiecki recommended that N.S. receive various accommodations
in all of her classes to help her cope with her disabilities.[3] (See
Dr. Osowiecki's Report at 16.)

Based on Dr. Osowiecki's report, as well as the fact that N.S.
had met her ninth-grade math goals and passed Algebra I, N.S.'s IEP
team concluded that N.S. no longer required a math goal or special
education services in math. (See Decision 5 ¶ 19; Tr. VII 179:6-24;
see also Admin. R. Pet'r's Ex. 26 ("Tenth-Grade IEP").)  Having
eliminated her math goal, the tenth-grade IEP identified only three
goals: "Self-Determination/Self-Advocacy," "Communication," and
"Study Skills." (See Tenth-Grade IEP 7.)  To help N.S. achieve those
goals, her tenth-grade IEP provided her with the following special
education and related services:  "Study skills period to provide
small group instruction," "Adaptive Physical Education," and "Speech
and Language Pathology Services."  (Id. at 16.)  The IEP also
outlined twenty-nine accommodations that would be provided to help
N.S. manage her disabilities at school, including: "direct adult
support when using the stairs," "visuals to accompany

---

[3]    Dr. Osowiecki differentiated between "accommodations" and
"special education services," stating that: "Special education
services require specially designed instruction that would involve
making changes to the curriculum for the student.  Accommodations
and modifications are changes to the way that material is presented,
changes to the way that the student is assessed, provisional
supports, such as . . . using a calculator or technology." (Tr. VI
88:16-24.)

instructions/directions," "[a]llow N.S. to type out lengthy writing assignments," "[a]dditional time for taking tests/quizzes and class work (up to 50% more)," and "[c]lass notes provided by using a copy of peer student notes or teacher notes." (Id. at 17-18.) The IEP also provided the following math-specific accommodations:

> [T]alk through calculation problems with [N.S.] use guiding questions to prompt her through errors; utilize models to complete math problems; avoid rote memorization, instead focus on how problems are thought through; use of a calculator as needed; encourage [N.S.] to highlight or color code key information.

(Id. at 18.)

N.S.'s parents disagreed with Dr. Osowiecki's assessment and with the school district's decision to eliminate math goals from the tenth-grade IEP and so they retained Dr. Allison Schetteni Evans, PhD to provide a second opinion. (Decision 5 ¶ 20.) After conducting a neuropsychological evaluation of N.S. in October of 2015, Dr. Evans concluded that her academic difficulties were not the result of a specific learning disability, but were attributable either to her slow processing speed, caused by her cerebral palsy, or to her limited social skills, caused by her autism. (See Admin. R. Pet'r's Ex. 3 ("Dr. Evans' Report"); see also, Tr. I 85:21-23, 89:11-16, 93:17-19, 95:13-18; Tr. VI 96:3-18.) Dr. Evans discussed N.S.'s educational needs mostly in terms of accommodations, rather than special education, but nonetheless opined that the pervasiveness of N.S.'s disabilities required her to have "special education support

in all of her classes." (Tr. V 42:16-17; 59:9-10; see generally Dr. Evans' Report.)

The school district made no changes to N.S.'s tenth-grade IEP in response to Dr. Evans' report, despite that N.S.'s parents voiced their concern that the pace of instruction was too fast and that N.S. needed extra instruction outside the classroom to be successful. (Decision 6 ¶ 23.) As a result, Plaintiffs sought a due process hearing to challenge the adequacy of the IEP.[4] That hearing occurred over eight days between February 25 and May 23, 2016. (See Decision 3.) After considering all of the evidence and submissions of the parties, the hearing officer issued a written decision concluding that N.S.'s tenth-grade IEP "which [did] not include [a] math goal, math objectives, or specialized instruction in math, [did] afford her access to a Free Appropriate Public Education" and that N.S. "is not entitled to compensatory services." (Decision 19.)

Dissatisfied with this outcome, N.S.'s parents filed a Complaint in this Court seeking review of the hearing officer's decision based on the allegation that it was "contrary to the preponderance of the evidence and to applicable federal and state statutes and precedents." (See Compl. 11, ECF No. 1.) Shortly thereafter, the parties cross-moved for summary judgment. The case

---

[4]    N.S.'s parents first sought a due process hearing on June 10, 2015 and amended that request on February 1, 2016. (See Pl.'s Obj. R. & R. 2; Pl.'s Undisputed Facts ¶¶ 65, 78.)

was referred to Magistrate Judge Almond, who recommended that the Court affirm the decision of the hearing officer.

## II. STATUTORY FRAMEWORK

"The IDEA was enacted to provide 'free appropriate public education' to children with disabilities." Doe v. Cape Elizabeth Sch. Dist., 832 F.3d 69, 73 (1st Cir. 2016) (citing 20 U.S.C. §§ 1400(d)(1)(A)). Substantively, the free appropriate public education ("FAPE") contemplated by the IDEA requires schools to provide, at public expense, "special education and related services," which are "sufficient to confer some educational benefit upon the handicapped child." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 200 (1982); see 20 U.S.C. § 1401(9).

"The 'primary vehicle' for delivery of a FAPE is an IEP." D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 34 (1st Cir. 2012). An IEP must include, "at a bare minimum, the child's present level of educational attainment, the short- and long-term goals for his or her education, objective criteria with which to measure progress toward those goals, and the specific services to be offered." Lessard v. Wilton Lyndeborough Coop. Sch. Dist., 518 F.3d 18, 23 (1st Cir. 2008) (citing § 1414(d)(1)(A)). In this context, the adequacy of a given IEP "turns on the unique circumstances of the child for whom it was created." Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S.Ct 988, 1001 (2017).

"A parent or guardian may challenge an IEP's adequacy by demanding a due process hearing before the state educational agency." Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086 (1st Cir. 1993) (citations omitted). If the hearing officer approves the IEP, then "the parent or guardian may seek further review in either state or federal court." Id.; 20 U.S.C. § 1415(i)(2)(A).

III. STANDARD OF REVIEW[5]

When reviewing a hearing officer's decision, the Court "shall receive the records of the administrative proceedings"; "shall hear additional evidence" if a party so requests; and "shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2). After analyzing those materials, the Court must make "an independent ruling based on the preponderance of the evidence." Esposito, 675 F.3d at 36 (quotations omitted). However, the court's independence is "tempered by the requirement that the Court give 'due weight' to the hearing officer's findings." Lt. T.B. ex rel. N.B. v. Warwick Sch. Comm., 361 F.3d 80, 83 (1st Cir. 2004); see also Rowley, 458 U.S. at 206 ("The fact that § 1415(e) requires that the reviewing court 'receive the records of the [state] administrative proceedings' carries with it the implied requirement

---

[5] "The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3). Here, Plaintiffs have properly objected to the reasoning, the findings, and the conclusions of Magistrate Judge Almond's R. & R. and, as such, the Court reviews the entire R. & R. de novo. (See Pl.'s Obj. to R. & R.).

that due weight shall be given to these proceedings.") (alteration in original).  Accordingly, the standard of review "falls somewhere between the highly deferential clear-error standard and the non-deferential de novo standard." Lessard, 518 F.3d at 24.

IV.  ANALYSIS

According to Plaintiffs, "the only issue in dispute is whether [N.S.] is entitled to any special education services in math, and, if she is, what services are required." (Pl.'s Opp'n to Defs.' MSJ 1-2, ECF No. 21.)  To suss out the answer to this question, N.S.'s parents advance two arguments: (1) that the hearing officer applied the wrong legal standard in assessing the adequacy of the IEP; and (2) that N.S.'s tenth-grade IEP, which did not call for special education services in math, deprived her of a FAPE.  (See Pl.'s Obj. to R. & R. 6, 10.)  N.S.'s parents bear the ultimate burden of proving, by a preponderance of the evidence, that the tenth-grade IEP did not afford N.S. a FAPE. See Schaffer ex. rel. Schaffer v. Weast, 546 U.S. 49, 62 (2005) ("The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief.")[6]

---

[6]    Although the parties have called the present procedure a "motion for summary judgment," the Court notes that "the procedure is in substance an appeal from an administrative determination, not a summary judgment." Capistrano Unified Sch. Dist. v. Wartenberg By & Through Wartenberg, 59 F.3d 884, 892 (9th Cir. 1995).  As such, the Court will not consider the facts in the light most favorable to the non-moving party, as it normally would when deciding a motion for summary judgment. Instead, the party seeking relief bears the burden

A. Whether the Hearing Officer Applied the Correct Legal Standard

Plaintiffs first argue that the hearing officer "fail[ed] to address the governing legal standard set out in _Endrew F._" (Pl.'s MSJ 6; Pl.'s Reply 4-5, ECF No. 46.) The record reflects that the hearing officer relied on the "meaningful educational benefit" standard, articulated by the First Circuit in _Esposito_, 675 F.3d 26. (_See_ Decision 10.) However, according to Plaintiffs, _Endrew F._ abrogated the "meaningful educational benefit standard" and, therefore, the hearing officer's decision was wrong as a matter of law. (_See_ Pl.'s Obj. to R. & R. 8.) This argument is unpersuasive.

The Supreme Court granted certiorari in _Endrew F._ to redress the Tenth Circuit's "de minimis" standard for determining whether an IEP afforded a student access to a FAPE. The Tenth Circuit had held that "a child's IEP is adequate as long as it is calculated to confer an educational benefit [that is] merely . . . more than _de minimis_." _Endrew F._, 137 S.Ct. at 997 (quotations omitted). The Supreme Court rejected that standard because, "[f]or children with disabilities, receiving instruction that aims so low would be tantamount to 'sitting idly . . . awaiting the time when they were old enough to "drop out"'." _Id._ at 1001 (quoting _Rowley_, 458 U.S. at 179). The Court concluded: "[t]he IDEA demands more. It requires an educational

_____

of proof. _See_ _Roland M. v. Concord Sch. Comm._, 910 F.2d 983, 991 (1st Cir. 1990).

program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Id.

Unlike the Tenth Circuit, the First Circuit's Esposito case held that "the IDEA calls for more than a trivial educational benefit." Esposito, 675 F.3d at 34. "[T]o comply with the IDEA, an IEP must be reasonably calculated to confer a meaningful educational benefit." Id. (emphasis added). A chasm separates "meaningful" from "de minimus" educational benefits; therefore, the Supreme Court's rebuff of the Tenth Circuit's de minimus standard does not necessarily abrogate the holding in Esposito.

Additionally, a fair comparison of Esposito's "meaningful educational benefit" standard and the standard announced in Endrew F. reveals that the two are substantively equivalent. For example, both standards require that an IEP must be tailored to the unique needs and disabilities of each individual student. Compare Endrew F., 137 S.Ct. at 1001 ("The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created."), with Esposito, 675 F.3d at 36 ("Only by considering an individual child's capabilities and potentialities may a court determine whether an educational benefit provided to that child allows for meaningful advancement.") (quotations omitted). Moreover, both standards advise courts to consider each child's potential for growth in assessing the adequacy of an IEP. Compare Endrew F., 137 S.Ct. at 999 ("An IEP . . . is constructed only after careful consideration

of the child's present levels of achievement, disability, and potential for growth.") (citations omitted), with Esposito, 675 F.3d at 36 (holding that, where a child's potential can be reliably ascertained, "'levels of progress must be judged with respect to the potential of the particular child.'") (quotations omitted). Finally, both standards emphasize that an adequate IEP is not necessarily an ideal IEP, nor is it one that maximizes a student's potential. Compare Endrew F., 137 S.Ct. at 1001 (holding that an IEP is adequate even if it does not "provide a child with a disability opportunities to achieve academic success, attain self-sufficiency, and contribute to society that are substantially equal to the opportunities afforded children without disabilities."), with Esposito, 675 F.3d at 34 ("[T]he IDEA sets modest goals: it emphasizes an appropriate rather than an ideal, education; it requires an adequate rather than an optimal, IEP.").

Based on the foregoing, the Court agrees with the Magistrate Judge that the law applied in the hearing officer's decision was consistent with the standard announced in Endrew F. As such, the hearing officer's findings and conclusions based on the First Circuit's "meaningful educational benefit" standard are entitled to "due weight." Rowley, 458 U.S. at 206. While it certainly would have been prudent for the hearing officer to discuss the impact of Endrew F. in his analysis, particularly since the parties submitted

supplemental briefing on that issue, that oversight does not invalidate his decision.

B. Whether the IEP Afforded N.S. Access to a FAPE

The remaining issue is whether N.S. required math goals and special education in math in order to access a FAPE. N.S.'s parents argue that N.S. was entitled to receive math goals and special education in math because "special education in math was not limited solely to students with learning disabilities in math but extended to students whose disabilities adversely affect their ability to learn math." (Pls.' Obj. to R. & R. at 10.) They also argue that the hearing officer should not have considered N.S.'s passing grades in determining the adequacy of the IEP because "a student with passing grades [is] nonetheless entitled to special education." (Id. at 8.) Additionally, N.S.'s parents contend that the that the hearing officer's findings and conclusions are not entitled to any deference because his decision "did not tie [his] findings and conclusions regarding the math issue to any specific facts in the record." (Id. at 13.)

After careful review of the hearing officer's decision and the administrative record, the Court finds that substantial evidence in the record supports the hearing officer's decision to approve the tenth-grade IEP and, therefore, N.S.'s parents have not met their burden of proving by a preponderance of the evidence that his decision was wrong.

First, the majority of witnesses who testified opined that N.S. did not require special education services in math. For example, John Jalette, the head of the special education department at Burriville High School, testified that N.S. had an "identified weakness in math" but stated that she did not require a "goal in math" in order to be successful, so long as she received "accommodations that would be general across the content area." (Tr. VII 10:19, 58:23-59:11.) Similarly, Kimberley Pristawa, the Director of Pupil Personnel Services for the Burriville School District, testified that N.S. was not eligible for special education services in math because she did not have a diagnosed learning disability in math and because she did "not need the content of instruction or delivery of instruction changed for her" but could benefit simply from various accommodations. (Tr. VIII 10:19-11:25). Additionally, N.S.'s ninth grade math teacher, Ashley Pleau, testified about her knowledge the work that N.S. completed during Algebra I and opined that N.S. did not need special education services in math so long as she received "added time" and "space" to process the material. (Tr. IV 110:17-18, 124:8-11.) Indeed, the witnesses generally agreed that the majority of N.S.'s academic difficulties could be improved with accommodations such as extra time, talking through calculation problems, and receiving notes before class and frequent prompting from her teachers.

Second, it is clear that the hearing officer did not improperly rely on N.S.'s passing grades in his decision. (Decision 5, 18.) In fact, at the behest of N.S.'s parents, the hearing officer cited to the First Circuit's decision in Cape Elizabeth for the proposition that "a student who had a strong academic record, including straight A grades and good performance on state standardized tests, may still have a need for special education and be entitled to special education and related services." (Decision 13 (citing Cape Elizabeth, 832 F.3d at 85).) He went on to acknowledge that N.S.'s parents had brought the Cape Elizabeth case to his attention primarily to counteract "the District's insistence throughout the case that [N.S.'s] passing grades meant she was not entitled to special education services in math." (Id.) However, it is also well-established that "[t]he grading and advancement system . . . constitutes an important factor in determining educational benefit." Rowley, 458 U.S. at 203. In this context, the hearing officer's finding that N.S. "continued to make academic progress in the area of math as demonstrated by her meeting the educational standards within the District" was clearly appropriate. (Decision 18 ¶ 3.)

Finally, N.S.'s parents argue that the hearing officer's decision is invalid because he "did not tie [his] findings and conclusions regarding the math issue to any specific facts in the record." (Pl.'s Obj. to R. & R. 13.) First, they take issue with the fact that the hearing officer "did not make a finding of fact

15

regarding N.S.'s need for reteaching" in math, even though N.S.'s ninth-grade math tutor, Barbara Menard, testified that N.S. needed "the chance to be retaught" to be successful. (Id. at 3.) Second, Plaintiffs fault the hearing officer and the Magistrate Judge for failing to mention the fact that N.S. scored a 350 on the math section of the PSAT, "which placed her at the seventh percentile nationally, and the low end of Burriville students." (Id. at 13.) Third, they argue that the hearing officer's finding that N.S. has "a disability that adversely affects her ability to learn" was insufficient because he should have made a more specific finding about whether her disabilities adversely affected her ability to learn math more than other subjects. (Id.)

None of these omissions requires remand. The hearing officer was not required to directly address every piece of evidence submitted by the parties, so long as he determined, based on a preponderance of the evidence, that N.S. did not require special education services in math to access a FAPE. See N.L.R.B. v. Beverly Enters.-Mass., 174 F.3d 13, 26 (1st Cir. 1999) ("An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party."); see also Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence."). Here, the hearing officer provided full and detailed findings in support of his conclusion to approve the IEP, including

16

a comprehensive recitation of the facts and applicable law, a brief summary of every witness's testimony, an analysis of parties' arguments, and a list of his specific factual findings. See Small v. Califano, 565 F.2d 797, 801 (1st Cir. 1977) (holding that the administrative adjudicator "has an obligation . . . to make full and detailed findings in support of his ultimate conclusion"). This perscrutation demonstrates that the hearing officer considered all of the evidence in the record, even if he did not reference every jot and tittle therein. See Beverly Enters.-Mass., 174 F.3d at 26. Accordingly, the hearing officer did not err when he omitted from his decision specific findings as to the significance of N.S.'s PSAT score, her alleged "need for reteaching" of math concepts, and whether her disabilities adversely affected her ability to learn math more than other subjects. (See Decision 18-19.)

Based on all of the foregoing, it is clear that the hearing officer's decision has substantial support in the record and must be affirmed.  It is entirely possible, and indeed probable, that the provision of a tutor and special education services in N.S.'s high school math classes would have maximized her educational potential. However, an adequate IEP is not necessarily an ideal IEP and the fact that N.S. likely would have benefitted from special education services and tutoring in math does not mean that the absence of those services in her tenth-grade IEP precluded her from accessing a FAPE. As the First Circuit has stated:

> The IDEA does not promise perfect solutions to
> the vexing problems posed by the existence of
> learning disabilities in children and
> adolescents. The Act sets more modest goals: it
> emphasizes an appropriate, rather than an ideal,
> education; it requires an adequate, rather than
> an optimal, IEP. Appropriateness and adequacy
> are terms of moderation. It follows that,
> although an IEP must afford some educational
> benefit to the handicapped child, the benefit
> conferred need not reach the highest attainable
> level or even the level needed to maximize the
> child's potential.

Lenn, 998 F.2d at 1086. The Supreme Court reiterated this sentiment in Endrew F., when it opined that "[a]ny review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal." 137 S. Ct. at 999.

Accordingly, "[w]here, as here, there is satisfactory record support for the appropriateness of the particular approach selected by the school department and approved by the state education agency, a reviewing court should not meddle." Lenn, 998 F.2d at 1091 n. 8; see also Rowley, 458 U.S. at 207, 208 (cautioning that "courts must be careful to avoid imposing their view of preferable educational methods" upon school districts because "courts lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy'") (quoting San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 42 (1973)).

V.   CONCLUSION

The Burriville School District complied with the IDEA in developing N.S.'s tenth-grade IEP and N.S.'s parents have not proved

by a preponderance of the evidence that the decision approving that IEP was wrong. <u>See</u> <u>Roland M.</u>, 910 F.2d at 991.

For the reasons herein stated, the Court ACCEPTS the R. & R. (ECF No. 40), which AFFIRMS the decision of the hearing officer, GRANTS Defendants' Motion for Summary Judgment (ECF No. 15), and DENIES Plaintiffs' Motion for Summary Judgment (ECF NO. 8).
IT IS SO ORDERED.

_William E. Smith_
Chief Judge
Date:  November 13, 2018